# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA

|  |  |  |
|---|---|---|
| BORDER STATES INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: |
| v. | ) | |
| | ) | |
| JEFFREY BRADFORD, JR., GLENN FORD, | ) | **VERIFIED COMPLAINT** |
| and GATEWAY ELECTRICAL SUPPLY, | ) | **(Jury Trial Demanded)** |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Border States Industries, Inc. ("Border States" or the "Company") files this Complaint for injunctive relief and damages against Defendants Jeffrey Bradford, Jr. ("Bradford Jr."), Glenn Ford ("Ford"), and Gateway Electrical Supply, LLC ("Gateway") (collectively, "Defendants") and alleges the following:

## I.     NATURE OF ACTION

1.      This dispute arises from the unlawful actions of Bradford Jr., Ford, and Gateway. While still employed by Border States, Bradford Jr. and Ford formed an agreement and acted in concert to acquire Border States' trade secrets and use the information they misappropriated to compete with Border States and solicit business away from Border States for the benefit of Gateway.  Bradford Jr. became an employee, consultant, and/or contractor of Gateway while he was a Border States employee.

2.      To achieve that shared goal, Bradford Jr. misappropriated, and likely continues to misappropriate, Border States' confidential, proprietary, and trade secret information.

3.    Bradford Jr. and Ford were both employees of Sequel Electrical Supply ("Sequel"), which was acquired by Border States in August of 2023.

4.    As a result of that acquisition, Bradford Jr. and Ford became employees of Border States in August of 2023, working out of Border States' Foley, Alabama branch.

5.    Border States, one of the largest electrical distributors in the country, spent years to develop its expertise in the industry, cultivating significant client relationships and establishing a presence in the Gulf Coast of the United States through its acquisition of Sequel.

6.    Through significant investment, Border States developed substantial knowledge and trade secrets that have enabled it to become a market leader.  This includes a vast client list, sensitive pricing information and customer data, and highly sensitive pricing guides for each of its customers.

7.    Bradford Jr.'s and Ford's unlawful scheming to deprive Border States of its trade secrets commenced no later than the summer of 2025.  At that time, Bradford Jr. and Ford—working with Eric Nisewonger ("Nisewonger"), another then-Border States employee—began to misappropriate Border States' trade secrets with the intent of retaining and using them to aid the growth of Gateway.

8.    In June 2025, Bradford Jr., working to arm Gateway with information critical to its growth and development, accessed nearly 1,300 Border States documents that included sensitive pricing guides, customer lists, information regarding ongoing and upcoming projects, and other information Border States took steps to protect from unauthorized access and use.

9.    This information is precisely the type of information a competitor would need to jumpstart its ability to compete with Border States and bypass the years of work and financial resources necessary to organically develop that institutional knowledge.

10.     On July 8, 2025, Gateway was formed as a Florida limited liability company, and Ford's and Bradford Jr.'s scheme to aid Gateway to Border States' detriment continued.

11.     Armed with Border States' trade secrets, Ford and Bradford Jr. began working for Gateway, ignoring Border States' efforts to protect its trade secrets and prevent the unauthorized use of its information to aid a competitor.

12.     Ford and Bradford Jr. are preparing to launch or already have launched Gateway in Alabama as Border States' competitor and are using or will use Border States' trade secrets to wrongfully compete.

## II.     THE PARTIES

13.     Plaintiff Border States is a corporation organized under the laws of the State of North Dakota with its principal place of business located at 2400 38th Street S., Fargo, North Dakota 58104.

14.     Defendant Jeffrey Bradford Jr. is an individual residing in Mobile County, Alabama at 3445 Deer Track Drive, Semmes, Alabama 36575.

15.     Defendant Glenn Ford is an individual residing in Baldwin County, Alabama at 2700 Steelwood Ridge Road, Unit C, Loxley, Alabama 36551.

16.     Defendant Gateway Electrical Supply, LLC is a limited liability company organized under the laws of the State of Florida with its principal place of business located at 47 Bayshore Dr., Pensacola, Florida 32507. Gateway is registered to conduct business in the State of Alabama.

## III.     JURISDICTION AND VENUE

17.     This Court has personal jurisdiction over Defendant Bradford Jr. because he is a resident of Alabama and therefore has sufficient material contacts with the State of Alabama.

3

18.    This Court has personal jurisdiction over Defendant Ford because he is a resident of Alabama and therefore has sufficient material contacts with the State of Alabama.

19.    This Court has personal jurisdiction over Gateway because it is registered in and conducts business from the State of Alabama, providing sufficient minimum contacts such that it may reasonably expect to be subject to the jurisdiction of this Court.

20.    This Court has original jurisdiction over this action under 28 U.S.C. § 1331, as Border States' Defend Trade Secrets Act claim arises under federal law, specifically, 18 U.S.C. § 1836, *et seq*.

21.    This Court has supplemental jurisdiction over Border States' remaining claims under 28 U.S.C. § 1367, as this Court has original jurisdiction over Border States' Defend Trade Secrets Act claim, and the remaining claims arise out of a common nucleus of operative fact as the base claim.

22.    Venue is proper in this Court because Defendant Gateway is registered to conduct business in Alabama and a substantial number of events giving rise to Border States' claims occurred in the Southern District.  Venue is proper for Defendant Bradford Jr. because he is an Alabama resident and a substantial number of events giving rise to Border States' claims occurred in the Southern District.  Venue is proper for Defendant Ford because he is a resident of Baldwin County, Alabama; the Southern District of Alabama includes Baldwin County.

## IV.    FACTUAL BACKGROUND

### A.    *Background Regarding Border States' Business*

23.    Border States is the sixth largest electrical distributor in the United States, providing supply chain products and services throughout the country.  As an electrical distributor, Border States serves as the critical link between electrical products manufacturers and end users such as

contractors, industrial facilities, and utilities.  Through its relationships with manufacturers and decades of industry experience, Border States delivers products tailored to their customers' specific needs at competitive and custom prices.  Border States services numerous clients in varied industries and markets, including the communications, construction, industrial, and utility sectors.

24.    In August 2023, Border States acquired Sequel, an electrical distributor that operated in the Gulf Coast of the United States and served the construction and industrial markets. Following the acquisition, Sequel operated as a division of Border States and Sequel's employees became Border States employees.

25.    The Sequel acquisition enabled Border States to establish a new presence in the region, as Sequel had eighteen locations across Louisiana, Mississippi, Alabama, and Florida – where Border States previously had no physical location.

26.    As of October 2025, Border States has approximately 3,500 employees located in over 125 branches across 29 states, including a branch in Foley, Alabama.

### B.    *Bradford Jr.'s and Ford's Employment with Border States*

#### i.    Bradford Jr.'s Employment with Border States

27.    Bradford Jr. commenced his employment with Sequel on March 6, 2018, and joined Border States in August 2023 following Border States' acquisition of Sequel.

28.    Bradford Jr. worked for Border States as an account manager in Border States' Foley, Alabama office.  His duties included: managing assigned customer account relationships; focusing on opportunity prospects and accounts; developing new customer accounts; coordinating sales strategies with preferred vendors; providing input on competitive issues related to price, margin strategy product evaluations, inventory requirements, and other related sales marketing, and service functions; and promoting Border States' products, services, and capabilities.

5

29.    As account manager, Bradford Jr. had access to Border States' confidential, proprietary, and trade secret information, which includes by way of example: protocols, procedures, and services; business and marketing plans and strategies; pending projects, bids, and proposals; potential and existing suppliers of Border States or its affiliates; historic practices and know-how; information relating to customers including customer lists, data, and preferences; designs, drawings, formulas, test data, marketing data, and pricing information; contracts and the status of negotiations; inventions and discoveries; financial data and accounting information; policies, procedures, manuals, systems, and employee information; research, reports, software, technology, legacy work product, and information about the Company's business and operations; and other similar documents and information

30.    Bradford Jr.'s employment with Border States was terminated on August 18, 2025.

ii.    Ford's Employment with Border States

31.    Ford commenced his employment with Sequel on May 11, 2022, and became a Border States employee in August 2023 following Border States' acquisition of Sequel.

32.    Ford worked for Border States as a branch manager in Border States' Foley, Alabama branch.  His duties included the daily oversight, administration, and management of all operations of the Foley branch.  He also was responsible for leading the Foley branch staff to attain successful customer experience, sales, profitability, and inventories.

33.    As branch manager, Ford had access to Border States' confidential, proprietary, and trade secret information, which includes by way of example: protocols, procedures, and services; business and marketing plans and strategies; pending projects, bids, and proposals; potential and existing suppliers of Border States or its affiliates; historic practices and know-how; information relating to customers including customer lists, data, and preferences; designs, drawings, formulas,

test data, marketing data, and pricing information; contracts and the status of negotiations; inventions and discoveries; financial data and accounting information; policies, procedures, manuals, systems, and employee information; research, reports, software, technology, legacy work product, and information about the Company's business and operations; and other similar documents and information.

34. On July 14, 2025, Ford abruptly resigned from Border States.

### C. *Border States' Protection of its Confidential Information and Trade Secrets*

35. Border States takes reasonable measures to protect its confidential, proprietary, and trade secret information, including by limiting access to its trade secret information, password protecting access to these files, entering into agreements with its employees, subjecting employees to its Code of Conduct and Handbook policies, and encrypting employees' work laptops and devices.

36. Border States protects its trade secrets through use of its enterprise resource software, SAP, which stores its costing, pricing, and margin information as well as inventory levels and related inventory planning information. Border States also uses SalesForce to control its customer and prospect information that is the product of Border States internal analysis and compilation to develop growth strategies for each of its customers.

37. SAP and SalesForce house information that Border States has methodically developed and cultivated, providing it with a competitive advantage in the market. This information includes: costing, pricing, and gross margin information as determined by vendor, products, and/or customers; inventory stocking levels to ensure the appropriate level of service for customers in specific markets; and business development and go-to-market strategies to gain new customers or grow business with existing customers.

7

38.     To provide additional protection for its trade secrets, Border States password-protects and limits access to SAP and SalesForce, providing access to certain information depending on the employee's title and role.  For example, account managers have access to SAP information that focuses primarily on managing customer data, viewing and managing sales orders, and viewing materials and sales data.

39.     Additionally, all Border States employees are subject to the policies and procedures outlined in the Border States Employee Handbook ("Handbook"), an excerpt of which is attached hereto as Exhibit 1.

40.     The Handbook specifies:

> Employees-owners have access to confidential and proprietary information regarding customers, vendors, internal Border States operations, co-workers and third-party contracts. The future of the Company, and employee-owners' opportunities within it, will be enhanced by the protection of the Company's intellectual property (including trade secrets and other Confidential Information). All employee-owners must keep this information private and not share it with family members, friends, competitors or others who do not have a need to know for legitimate business purposes. It is each employee-owner's responsibility to safeguard Confidential Information when employed and after leaving Border States, to the maximum extent permitted by applicable law.

(Ex. 1 at 16.)

41.     The Handbook defines "Confidential Information" as "(i) competitively sensitive information, (ii) of importance to Border States, (iii) that is not publicly available and is kept in confidence by Border States and (iv) that becomes known to the employee-owner through their employment with Border States." (*Id.*)

42.     The Handbook further clarifies that Confidential Information includes "Border States' trade secrets, protocols, procedures and services, business and marketing plans and strategies, pending projects and proposals, and potential and existing suppliers of Border States or its affiliates." (*Id.*)

8

43.     Similarly, the Handbook provides that "misuse, unauthorized access to or mishandling of Confidential Information is strictly prohibited[,]" and specifies that, to protect Border States' Confidential Information, including its trade secrets, employees must comply with the following:

- Files should remain on premises and not be left on desktops or other locations where unauthorized persons may have access to them.

- Unattended laptops, smartphones or tablets should not be left unlocked or in any location where unauthorized persons may have access to them.

- A customer's private data, especially credit card information, is not to be independently stored anywhere (i.e., on sticky notes, an employee-owner's desktop or in your computer)

(*Id.*)

44.     Engaging in a competing business while employed by Border States is likewise prohibited under the Handbook, which states:

> Outside employment cannot involve or compete with products or services presently provided or under development by Border States. Outside employment cannot make use of any of Border States' Confidential Information. Employee-owners cannot work in any capacity for any of Border States' vendors, customers or competitors. Employee-owners who are on any type of leave from Border States cannot perform any outside employment (including self-employment) that involves the employee-owner engaging in activities inconsistent with (i) any applicable medical restrictions, and/or (ii) the purpose of the leave.

(*Id.* at 18.)

### D.     Bradford Jr.'s and Gateway's Misappropriation of Border States' Trade Secrets

45.     Through a Border States investigation, the Company learned that Gateway Electrical Supply LLC was organized on May 30, 2025, according to Gateway's registration application with the Florida Department of State. (Exhibit 2.)

46.     On July 8, 2025, Articles of Organization were filed with the Florida Department of State Division of Corporations, for a Florida Limited Liability company named "Gateway Electrical Supply LLC" (the "Gateway Articles"). (Exhibit 3.)

47.     The Gateway Articles list Sharon Joanne Nisewonger, Nisewonger's wife, as Gateway's manager.

48.     The Gateway Articles also specify the address of the new entity as 47 Bayshore Dr., Pensacola, Florida 32507, the same address Border States has on file for Nisewonger's residence.

49.     Ford resigned from Border States on July 14, 2025, less than one week after Gateway's formation and, according to Ford's LinkedIn profile, he commenced employment with Gateway Electrical Supply in July 2025. (Exhibit 4.)

50.     On information and belief, Bradford Jr. began working for Gateway on or before June 18, 2025.

51.     On August 13, 2025, Dustin Meredith ("Meredith") sent an email on behalf of United Electrical Sales, Ltd. ("UES") to Ford and Bradford Jr. that was intended for Gateway. (*See infra* Bluml Decl., Ex. D.)  The August 13 email appears to respond to a request from Ford, on behalf of Gateway, for pricing information for Elite Components' electrical fasteners.  The email included a spreadsheet entitled "Elite Cross Reference Partner Pricing 4 15 2025." (*Id.*)

52.     UES is a vendor representative serving Border States and other distributors in the Gulf states region, including Alabama. UES represents a number of vendors and manufacturers of electrical products, including Elite Components, Inc. ("Elite Components").

53.     Border States purchases electrical products through UES, including some from Elite Components for specific customer projects.   Bradford Jr. and/or Ford developed a relationship with UES while working for Border States.

54.     The email was sent to Ford as a Gateway employee via his Gateway email address. Bradford Jr. received the email to his Border States email address, since he was still employed by Border States.  (*See infra* Bluml Decl., Ex. D.)

55.     On information and belief, Meredith intended to communicate with Bradford Jr. via the email address he had been using to conduct business for Gateway while still employed by Border States.  Instead, Meredith inadvertently copied Bradford Jr.'s Border States email address, having previously communicated with Bradford Jr. for Border States.

56.     The following morning, on August 14, 2025, Meredith unsuccessfully attempted to electronically recall the message he sent to Bradford Jr.'s Border States email. (*Id.*)

57.     Later that day, Border States CEO, Jason Seger, was alerted by an industry counterpart that then-current and former employees were diverting business from Border States to a newly created entity that had been recently formed by former employees – Gateway Electrical Supply.

58.     Alerted to this misconduct, Border States investigated the allegation and learned of Gateway's existence.  Border States also interviewed Bradford Jr. and asked about his potential involvement in the solicitation of Border States' clients and diversion of Border States' business to Gateway.

59.     Bradford Jr. confessed that he was considering leaving Border States to work for Nisewonger and Ford at Gateway.

60.     On August 18, 2025, Border States terminated Bradford Jr.'s employment.

61.    Gateway was registered to conduct business in Alabama on September 1, 2025. Gateway's registered office address is in Dothan, Alabama. (Exhibit 5.)  On information and belief, Gateway has a physical office in Foley, Alabama. (Exhibit 6.)

### E.    Border States' Investigation & Findings

62.    To assess the extent to which Nisewonger, Bradford, and Ford misappropriated Border States trade secrets to jump start Gateway's technical expertise prior to their departures, Border States engaged a third-party forensic analysis expert, Carney Forensics ("Carney"), to conduct a review of the departing employee's laptops for indications of unlawful conduct.

63.    Carney's review revealed that Bradford Jr.'s misconduct began long before he, Ford, or Nisewonger resigned. (Exhibit 7, Declaration of Kevin Bluml ("Bluml Decl.")).

64.    Bradford Jr.'s disloyal and unlawful behavior began no later than June 18, 2025, when he connected an external USB device to his work computer. (*Id.* at ¶ 11.) The following day, on June 19, 2025, Bradford Jr. accessed 1,291[1] Border States files in 94 seconds—3:22:55 CST to 3:24:29 CST—from the "Downloads" folder of his Border States computer. (*Id.* at ¶¶ 12-13.) The files included, but were not limited to, Border States' client lists, project account information, project quotes, prospective project bids, legacy work product, strategies, pricing and financial data unique to Border States, historic practices and know-how, and other similar documents and information.  (Bluml Decl., Ex. C.)  The forensic review revealed that Bradford Jr.'s rapid access of nearly 1,300 files is indicative of mass-copying of files to an external storage device. (*Id.* at ¶ 11.)

---

[1] In total, Bradford Jr. accessed 1,526 files within this period, of which 235 files appear to be personal documents unrelated to Border States' claims. (Bluml Decl. at ¶ 13.)  On information and belief, those 235 files are personal files over which Border States' does not claim trade secret misappropriation.

65.     On information and belief, Bradford Jr.'s transferred and/or copied roughly 1,300 files from his Border States computer to the external USB device that he had connected the day before. (*Id.*)

66.     As detailed above, Bradford Jr. impermissibly caused Border States' confidential, proprietary, and trade secret information to be disclosed from Border States and onto Bradford Jr.'s personal device or otherwise into Bradford Jr.'s possession and control away from Border States. Among the nearly 1,300 documents Bradford Jr. impermissibly transferred or copied are the proprietary, confidential, and trade secret documents identified below.

67.     **Alabaster**. On June 19, 2025, Bradford Jr. accessed, transferred, and/or copied the document Alabaster – Original Version ("Alabaster") from Border States' systems to an external USB device. The Alabaster document is a quote generated from Border States' system on June 11, 2025, for a load center and circuit breakers from its vendor, ABB, for the Alabaster project. The quote is marked "Proprietary and Confidential" and includes pricing and lead time information that was crafted from Border States' system.

68.     **Fairhope High School BOM.** On June 19, 2025, Bradford Jr. accessed, transferred, and/or copied the document Bom Export (1) ("Fairhope High School BOM") from Border States' systems to an external USB device. The Fairhope High School Export is a bill of materials ("BOM"), a list containing all of the raw materials, sub-assemblies, sub-components, parts, and quantities from one of Border States' key vendors and that were required for the Fairhope High School project in Baldwin County, Alabama. This spreadsheet includes unit cost information.

69.     **Springhill Medical Center ESL.** On June 19, 2025, Bradford Jr. accessed, transferred, and/or copied the document Springhill Medical Center ESL 8312-1200 (005)

13

("Springhill Medical Center ESL") from Border States' systems to an external USB device. Springhill Medical Center ESL is a quote from ESL Power Systems to Sequel on June 4, 2025, for a wall-mounted transfer switch for the Springhill Medical Center, located in Mobile, Alabama. This product needed to be engineered, so the Springhill Medical Center ESL quote is based on and derived from the proprietary project designs and drawings that Border States supplied.

70.    **Springhill Medical Center Panel.** On June 19, 2025, Bradford Jr. accessed, transferred, and/or copied the document ISO Panel Quote ("Springhill Medical Center Panel") from Border States' systems to an external USB device. The Springhill Medical Center Panel is a quote that Border States' vendor, PG LifeLink, created on June 9, 2025 for several panels. The quote was specifically designed for the Springhill Medical Center project in Mobile, Alabama. The panels that Border States required for the project needed to be engineered and constructed to the specifications of the project. This quote was crafted for custom products and based on the project specifications and drawings supplied by Border States.

71.    **Stoway Storage Pricing.** On June 19, 2025, Bradford Jr. accessed, transferred, and/or copied the document Stoway Storage Bldg J – Original Version ("Stoway Storage Pricing") from Border States' systems to an external USB device. The document is a quote generated from Border States' system on May 29, 2025 for ABB panelboards for the Stoway Storage project. The quote is marked "Proprietary and Confidential" and includes trade secret pricing and lead time information derived from Border States' system.

72.    **Sunliner Diner 1**. On June 19, 2025, Bradford Jr. accessed, transferred, and/or copied the document Sunliner Diner Lighting Contactor – Original Version ("Sunliner Diner 1") from Border States' systems to an external USB device. Sunliner Diner 1 is a quote generated

from Border States' system on June 17, 2025 for lighting contactors from ABB for the Sunliner Diner project. Sunliner Diner 1 is marked "Proprietary and Confidential" and contains trade secret pricing and lead time information that was crafted from Border States' system.

73.     **Sunliner Diner 2.** On June 19, 2025, Bradford Jr. accessed, transferred, and/or copied the document SQ266125-01 – Sunliner Diner -  - SEQ FO – LST (1) (003) ("Sunliner Diner 2") from Border States' systems to an external USB device. Sunliner Diner 2 is a quote from SESCO Lighting to Border States on June 6, 2025 for custom lighting. This quote was crafted to Border States' specifications and was based on the lighting products required for the Sunliner Diner project.

74.     **Sunliner Diner 3.** On June 19, 2025, Bradford Jr. accessed, transferred, and/or copied the document 24-46980-6 SUNLINER DINER ("Sunliner Diner 3") from Border States' systems to an external USB device. Sunliner Diner 2 is a submittal by AMA Lighting on May 21, 2025, for lighting fixtures and related products to be used in the Sunliner Diner project. The submittal includes the specifications, designs, and custom drawings of engineered lighting products based on the details Border States had shared regarding the Sunliner Diner project.

75.     **University of Alabama Status Report.** On June 19, 2025, Bradford Jr. accessed, transferred, and/or copied the document OrderStatusReport-2025_06_05_11_06_26 ("University of Alabama Status Report") from Border States' systems to an external USB device. The University of Alabama Status Report is a report generated by a supplier of Border States, Siemens, that was tailored and specified to Border States' bid for new business for the University of Alabama's Coleman Coliseum. The report includes list prices, discounts, net prices, and sell prices for over 130 different Siemens products, all based upon Border States' relationship with Siemens.

The information contained in the University of Alabama Status Report was unique to Border States and specific to its bid for new business.

76.     **University of Alabama Panelboards.** On June 19, 2025, Bradford Jr. accessed, transferred, and/or copied the document UA Coleman Panelboards ("University of Alabama Panelboards") from Border States' systems to an external USB device. The University of Alabama Panelboards is a submittal from Border States' vendor, Siemens, on May 27, 2025, for panelboards to be used at the University of Alabama's Coleman Coliseum. The submittal included a BOM, specification information for the panelboards, and detailed drawings specific to Border States' project.

77.     These documents related to Border States' pending and ongoing projects or proposals and were not otherwise publicly available or calculable.

78.     There is no business reason that would require Bradford Jr. to access or copy these files in such a short period of time.

79.     Carney's forensic review also uncovered illicit file access by Nisewonger.

80.     Specifically, on August 5, 2025, his last day of employment with Border States, Nisewonger accessed a Microsoft OneDrive folder on his Border States laptop. (Bluml Decl. at ¶ 9.)

81.     Ten of the files were accessed within 12 seconds—between 18:14:35 CST and 18:14:48 CST. (*Id.*)

82.     The rapid access of numerous files in a compressed amount of time is indicative of files that were mass-accessed and potentially copied to an external storage drive. (*Id.* at ¶ 10.)

83.     Each of the files Nisewonger accessed on his last day of employment included Border States trade secrets such as customer lists for the Pensacola branch, pricing and gross

margin reports, inventory management strategies, customer pricing strategies, and information relating to discounts Border States provides for specific client relationships. (Bluml Decl. at Ex. C.) ¶

84.     As with Bradford Jr., there was no business reason that would require Nisewonger to access or copy these files in such a short period of time, especially when his employment was set to end just hours later.

85.     Equipped with Border States' trade secret information, Bradford and Nisewonger were able to misappropriate significant information regarding Border States' client relationships and pricing strategies, arming Gateway with strategic details necessary to jump start a business without investing the time and resources necessary to develop client relationships and industry knowledge critical to establishing a presence in the market.

### F.     Post-Termination Cease & Desists

86.     Following Border States' discovery of Bradford Jr.'s unauthorized access and transfer of its trade secrets, it contacted Nisewonger, Bradford Jr., and Ford to demand that each return the misappropriated files and to prevent Gateway from unlawfully competing.

87.     On August 29, 2025, Border States served a Cease-and-Desist letter on Bradford Jr. demanding he redirect back to Border States any business that he had diverted from Border States to Gateway.  Border States also demanded Bradford Jr. return Border States' trade secret and confidential information.  Border States has not received any response from Bradford Jr. (Exhibit 8.)

88.     On August 29, 2025, Border States served a Cease-and-Desist letter on Ford demanding he redirect back to Border States any business that he had diverted from Border States

to Gateway. Border States also demanded Ford return Border States' trade secret and confidential information. Border States has not received any response from Ford. (Exhibit 9.)

89.     On August 29, 2025, Border States served a Cease-and-Desist letter on Gateway, through Nisewonger, demanding it redirect back to Border States any business that had been diverted to Gateway from Border States and that it return Border States' trade secret and confidential information.  Border States has not received any response from Gateway or Nisewonger. (Exhibit 10.)

90.     None of the three responded, and each still retains the Border States trade secrets they misappropriated prior to their departure from Border States. After sending the cease-and-desist letters, Border States spent additional time forensically investigating Defendants' misconduct and engaging legal counsel to bring this Complaint.

91.     On information and belief, Gateway is now in possession of at least 1,291 documents including Border States most sensitive information, such as client lists, pricing guides, project strategies, information relating to ongoing and upcoming projects, sensitive financial planning documents, and detailed invoices of client accounts.

92.     On information and belief, armed with the trade secrets Bradford Jr. accessed and copied on June 19, 2025, Ford, Bradford Jr., and Gateway now intend to use or are using the treasure trove of sensitive Border States documents to launch Gateway into a Border States competitor, without having had to devote the time and resources necessary to grow, as Border States had.

## V.     CAUSES OF ACTION

### COUNT ONE

### Misappropriation of Trade Secrets under the Defend Against Trade Secrets Act

**(Against Bradford Jr. and Gateway)**

93.     Border States incorporates and re-alleges the aforementioned paragraphs as if fully set forth herein.

94.     The Defend Trade Secrets Act ("<u>DTSA</u>") defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measure to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. *See* 18 U.S.C. §§ 1836, 1839.

95.     Historical and current bids, pricing, customer lists, sales, quotes and other information used to develop customer bids and proposals or service customers are protectable trade secrets under the DTSA. *See Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003); *TruTemp Refrigeration & Com. Climate, LLC v. Mowbray*, No. 1:23-CV-667-ECM, 2023 WL 8004818, at *5 (M.D. Ala. Nov. 17, 2023); *Advantus, Corp. v. Egan*, No. 3:23-CV-1393-MMH-PDB, 2023 WL 8373383, at *4 (M.D. Fla. Dec. 4, 2023).

96.     Defendants Bradford Jr. and Gateway acquired and/or are using Border States' trade secrets by improper means and without authorization. Bradford Jr. obtained trade secrets from Border States through having accessed and retained Border States' confidential and proprietary information and trade secrets, and he failed to return and cease using that information upon the termination of his employment with Border States.

97.     As illustrated in Paragraphs 67-76 above, the documents Bradford Jr. copied or otherwise transferred to an external storage device, as described above, constitute trade secrets within the meaning of the DTSA.  Border States derives independent economic value from such information not being generally known to, or readily ascertainable by proper means by, the public,

other persons can obtain economic value from its disclosure or use, and it is the subject of significant efforts to maintain its secrecy.

98.    As stated above, Border States takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

99.    Bradford Jr. knew or should have known that Border States' trade secrets: (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by Border States at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Border States' competitors; (e) would provide significant benefit to a competitor seeking to compete with Border States; and (f) are critical to Border States' ability to conduct its business successfully.

100.    Bradford Jr. transferred and/or wrongfully obtained and accessed Border States' trade secrets and failed to return Border States' information, despite being obligated to return such information.

101.    By retaining, disclosing, or using, and/or threatening to retain, disclose, or use Border States' trade secrets, Bradford Jr. has misappropriated or threatens to misappropriate Border States' trade secrets in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

102.    The information that Bradford Jr. has misappropriated or threatens to misappropriate relates to Border States' highly confidential business relationships, financial information, and pending projects. This information includes plans, drawings, specifications, designs, and pricing related to its pending projects, bids, and pitches for future work.

103.    Bradford Jr.'s continued retention, disclosure, or use and/or threatened retention, disclosure, or use of Border States' trade secrets will harm and/or threaten to harm Border States and its legitimate business interests.

104.    Bradford Jr.'s actions were and are willful and malicious.

105.    If Bradford Jr. further retains, discloses, or uses the information pertaining to Border States' trade secrets, it could destroy Border States' competitive advantage, which Border States has devoted substantial time and resources to build.

106.    Because Bradford Jr.'s misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, Border States requests that this Court grant injunctive relief against Bradford Jr. from actual or threatened retention, disclosure, or utilization of Border States' trade secrets.

107.    Gateway had and/or has access to Border States' confidential, proprietary and trade secret information by way of Bradford Jr. Specifically, Gateway had and/or has access to, *inter alia*, Border States' customer lists, project quotes, prospective bids, strategies, pricing, drawings, specifications, and proposals. This information was developed over the course of many years, and Border States spent considerable time, energy, and resources doing so.

108.    As stated above, this information constitutes trade secrets under the DTSA because Border States derives independent economic value from this information not being generally known to the public, not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

109.    Border States has taken reasonable measures to keep this information secret and confidential and out of the hands of its competitors, including by limiting access to its trade secret

information, password protecting access to its files, subjecting Bradford Jr. to its Code of Conduct and Handbook policies, and encrypting employees' laptops and work devices.

110.    Gateway had (and has) duties not to misappropriate Border States' confidential and proprietary information, including its trade secrets.

111.    Based on these facts, Gateway misappropriated Border States' trade secrets without its consent, in violation of the DTSA.

112.    Gateway knows or should know that the information that it improperly acquired, used, and/or is using is Border States' trade secrets.

113.    Gateway's actions are willful and malicious.

114.    The information that Gateway improperly acquired, used, and/or is using relates to Border States' highly confidential business relationships, financial information, and pending projects.  This information includes plans, drawings, specifications, designs, and pricing related to its pending projects, bids, and pitches for future work.

115.    Gateway is or will be unjustly enriched by its misappropriation of Border States' trade secrets and, unless restrained, Gateway will continue to use, divulge, and otherwise misappropriate Border States' trade secrets and confidential information.

116.    Because of the actual misappropriation of Border States' trade secrets, Border States has been injured and faces irreparable injury.  In addition to a remedy at equity, Border States seeks actual, incidental, compensatory, punitive, and consequential damages, and attorneys' fees and costs.

117.    As a result of Gateway's misappropriation of trade secrets, Border States has suffered significant harm including, but not limited to, lost business, interference with Border States' operations, and damage to Border States' reputation. Border States has also had to retain a

third-party forensic analyst to assess the depth of trade secret misappropriation and the undersigned counsel, incurring reasonable costs and attorneys' fees to bring this action.

WHEREFORE, Border States is entitled to injunctive relief and to judgment against Bradford Jr. and Gateway in a sum to be proven at trial, plus interest, attorneys' fees, costs, and such other relief as this Court deems just and equitable.

## COUNT TWO

### Misappropriation of Trade Secrets in Violation of the Alabama Trade Secrets Act
**(Against Bradford Jr. and Gateway)**

118.    Border States incorporates and re-alleges the previous paragraphs as if fully set forth herein.

119.    Bradford Jr. had access to Border States' confidential, proprietary and trade secret information while working for Border States, including its project quotes, prospective bids, strategies, BOMs, pricing and financial information, designs, drawings, specifications, proposals, and other trade secret information.  He likewise had access to BOMs of Border States' customers, product and material specifications, business plans, designs, information about the Company business, and financial data unique to Border States, historic practices and know-how.  This information was developed over the course of many years, and Border States spent considerable time, energy, and resources doing so.

120.    This information constitutes trade secrets, pursuant to the Alabama Trade Secret Act ("ATSA"), Ala. Code § 8-27-1, *et seq.*, because Border States uses this information in its business, it derives significant economic value from this information not being publicly known, not being generally known in Border States' business, and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

121.    Information pertaining to historical and current bids, pricing, customers, sales, proposals, and quotes is protectable trade secrets under the ATSA.  *See Penalty Kick*, 318 F.3d at 1291; *TruTemp Refrigeration*, 2023 WL 8004818, at *5; *Ex parte W.L. Halsey Grocery Co.*, 897 So. 2d 1028, 1034 (Ala. 2004).

122.    Border States has taken reasonable measures to keep this information secret and confidential and out of the hands of its competitors, including by limiting access to its trade secret information, password protecting access to these files, subjecting Bradford Jr. to its Code of Conduct and Handbook policies, and encrypting employees' laptops and work devices.

123.    Bradford Jr. had (and has) duties not to misappropriate Border States' Confidential Information, including its trade secrets, or to disclose such information outside of Border States.

124.    Bradford Jr. misappropriated, threatens to misappropriate, and/or intends to disclose Border States' trade secrets without its consent, in violation of Alabama law.  Bradford Jr. and Gateway cannot maintain similar and/or identical relationships with Border States' clients without utilizing and disclosing Border States' confidential, proprietary, and trade secret information.

125.    Specifically, as discussed above, Bradford Jr. deliberately and improperly accessed and copied or otherwise transferred 1,291 files to his external USB device.  These files largely consisted of Border States' trade secret information, relating to Border States' highly confidential business relationships, financial information, and pending projects.  This information includes plans, drawings, BOMs, specifications, designs, and pricing related to its pending projects, bids, and pitches for future work.

126.    The information contained in these files is included or embodied in patterns, compilations, drawings, methods, techniques, or processes.  It is "clearly used or intended for use

24

in [Border States'] business" because the documents are "used to forecast sales, to determine what prices should be quoted to certain customers, to create financial statements . . . and to conduct other standard business practices." *See Ex parte W.L. Halsey Grocery Co.*, 897 So. 2d at 1034.

127.    Bradford Jr.'s use and disclosure, or impending use and disclosure, of Border States' trade secrets is a breach of the confidence and trust Border States expected of him, as evidenced by the Code of Conduct and Handbook policies that Bradford Jr. acknowledged and agreed to be bound by.

128.    Bradford Jr. is using and disclosing, or will use and disclose, Border States' trade secrets relating to, at a minimum, Border States' project quotes, prospective bids, strategies, pricing and financial information, designs, drawings, specifications, and proposals to compete against Border States.  Bradford Jr. knows or should know that the information that Bradford Jr. improperly downloaded and continues to possess is Border States' trade secrets.

129.    Bradford Jr.'s actions were and are willful and malicious.

130.    Bradford Jr. is or will be unjustly enriched by their misappropriation of Border States' trade secrets and, unless restrained, Bradford Jr. will continue to use, divulge, and otherwise misappropriate Border States' trade secrets and confidential information.

131.    Because of the actual misappropriation of Border States' trade secrets, Border States has been injured and faces irreparable injury.  In addition to remedy at equity, Border States seeks actual, incidental, compensatory, exemplary, consequential damages, and attorneys' fees and costs.  Border States also seeks to recover all profits and other benefits conferred on Bradford Jr. by the misappropriation that are attributable to the misappropriation.

132.    As a result of Bradford Jr.'s misappropriation of trade secrets, Border States has suffered significant harm including, but not limited to, interference with Border States' business

operations, time and costs in reassuring clients that their accounts are secure at Border States, and damage to Border States' reputation with its clients with whom Bradford Jr. worked. Border States has also had to retain the undersigned counsel and incur reasonable attorneys' fees to bring this action.

133.    Gateway had and/or has access to Border States' confidential, proprietary and trade secret information by way of Bradford Jr. Specifically, Gateway had and/or has access to, *inter alia*, Border States' project quotes, prospective bids, strategies, BOMs, pricing and financial information, designs, drawings, specifications, and proposals.  This information was developed over the course of many years, and Border States spent considerable time, energy, and resources doing so.

134.    As stated above, this information constitutes trade secrets under the ATSA because Border States derives significant economic value from this information not being publicly known, not being generally known in Border States' business, and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

135.    Border States has taken reasonable measures to keep this information secret and confidential and out of the hands of its competitors, including by limiting and password protecting access to its trade secret information.

136.    Gateway had (and has) duties not to misappropriate Border States' confidential and proprietary information, including its trade secrets.

137.    Based on these facts, Gateway misappropriated Border States' trade secrets without its consent, in violation of the ATSA.

138.    Gateway knows or should know that the information that it improperly acquired,

used, and/or is using is Border States' trade secrets.

139.    Gateway's actions were and are willful and malicious.

140.    Gateway is or will be unjustly enriched by its misappropriation of Border States' trade secrets and, unless restrained, Gateway will continue to use, divulge, and otherwise misappropriate Border States' trade secrets and confidential information.

141.    Because of the actual misappropriation of Border States' trade secrets, Border States has been injured and faces irreparable injury. In addition to a remedy at equity, Border States seeks actual, incidental, compensatory, exemplary, and consequential damages, and attorneys' fees and costs.  Border States also seeks to recover all profits and other benefits conferred on Gateway by the misappropriation that are attributable to the misappropriation.

142.    As a result of Gateway's misappropriation of trade secrets, Border States has suffered significant harm including, but not limited to, interference with Border States' business operations, time and costs in reassuring clients that their accounts are secure at Border States, and damage to Border States' reputation with its clients.  Border States has also had to retain the undersigned counsel and incur reasonable attorneys' fees to bring this action.

WHEREFORE, Border States is entitled to injunctive relief and to judgment against Defendants in a sum to be proven at trial, plus interest, attorneys' fees, costs, and such other relief as this Court deems just and equitable.

## COUNT THREE

### Civil Conspiracy to Misappropriate Border States' Trade Secrets in Violation of the Alabama Trade Secrets Act
**(Against Bradford Jr. and Ford)**

143.    Border States incorporates and re-alleges the previous paragraphs as if fully set forth herein.

144.    While employed at Border States, Ford was responsible for supervising and directing Bradford Jr.'s conduct.

145.    On information and belief, Ford continues to serve in a higher authority position at Gateway.  At Gateway, Ford operates in partnership or otherwise supervises and directs Bradford Jr.

146.    Bradford Jr. and Ford formed an agreement to misappropriate Border States' trade secrets, use the trade secrets therein to solicit Border States' clients, and divert business away from Border States for the benefit of Gateway.

147.    Bradford Jr. and Ford took concerted action to misappropriate Border States' trade secrets.  To achieve their agreement, as explained above, Bradford Jr. accessed and downloaded or otherwise transferred nearly 1,300 files from Border States' system to an external USB device. Those files largely consisted of Border States' confidential, proprietary, and trade secret information.

148.    Bradford Jr. misappropriated, threatens to misappropriate, and/or intends to disclose Border States' trade secrets without its consent, in violation of the DTSA and ATSA.

149.    Bradford Jr. is using and disclosing, or will use and disclose, Border States' trade secrets relating to, at a minimum, Border States' project quotes, prospective bids, strategies, BOMs, pricing and financial information, designs, drawings, specifications, and proposals, to compete against Border States.  Bradford Jr. knows or should know that the information that Bradford Jr. improperly downloaded and continues to possess is Border States' trade secrets.

150.    Ford is using and disclosing, or will use and disclose, Border States' trade secrets relating to, at a minimum, Border States' project quotes, prospective bids, strategies, BOMs, pricing and financial information, designs, drawings, specifications, and proposals, to compete

against Border States.   Ford knows or should know that the information that Bradford Jr. improperly downloaded and continues to possess is Border States' trade secrets.

151.    Bradford Jr. and Ford formed and carried out their agreement with actual knowledge and intent.

152.    For Bradford Jr. and Ford to accomplish their shared goal, Bradford Jr. and/or Ford used and/or are using Border States' trade secret information to solicit and/or acquire competitive pricing from suppliers.

153.    Bradford Jr. and Ford's agreement is evidenced by the August 13, 2025, email from Meredith of UES to Ford's Gateway email address and Bradford Jr.'s Border States email address.

154.    In the email, Meredith responded to Ford's and/or Bradford Jr.'s request for pricing information for the benefit of Gateway, attaching a spreadsheet entitled "Elite Cross Reference Partner Pricing 4 15 2025."

155.    On information and belief, Meredith provided Ford, Bradford Jr., and Gateway with "Partner Pricing" based upon Border States' pricing information and/or partnership with UES.

156.    On information and belief, Ford and Bradford Jr. are using and/or will use Border States' trade secret information to evaluate the pricing information Meredith sent and compete with Border States.

WHEREFORE, Border States is entitled to judgment against Bradford Jr. and Ford in a sum to be proven at trial, plus interest, attorneys' fees, costs, and such other relief as this Court deems just and equitable.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Border States prays for the following relief:

a)    Judgement in favor of Border States against Bradford Jr. and Gateway for Count I herein and an award of damages and recovery of any profits or other benefits in an amount to be proven at trial;

29

b)      Judgment in favor of Border States against Bradford Jr. and Gateway for Count II herein and an award of damages in an amount to be proven at trial;

c)      Judgment in favor of Border States against Bradford Jr. and Ford for Count III herein and an award of damages in an amount to be proven at trial;

d)      An order that Defendants immediately cease and desist from directly or indirectly further disclosing or using for themselves or any other person any Confidential Information of Border States;

e)      An order requiring Defendants to preserve and permit forensic examination of their computers and other electronic devices as follows:

      i.    Within three (3) days of this Court's order, Bradford Jr. shall produce to a qualified forensic expert all of Bradford Jr.'s personal computers, tablets, phones, USB devices, cloud storage accounts, or other electronic devices or accounts capable of storing data, in Bradford Jr.'s possession, custody, or control. Bradford Jr. shall also have such expert forensically image his personal email account(s).

      ii.   Within three (3) days of this Court's order, Ford shall produce to a qualified forensic expert all of Ford's personal computers, tablets, phones, USB devices, cloud storage accounts, or other electronic devices or accounts capable of storing data, in Ford's possession, custody, or control. Ford shall also have such expert forensically image his personal email account(s).

      iii.  Within three (3) days of this Court's order, Gateway shall produce all Gateway owned laptops, external hard drives, tablets, company owned phones, USB devices, cloud storage accounts, or other electronic devices or accounts capable of storing data, in Gateway's possession, custody, or control.

      iv.   Within seven (7) days of this Court's order, Defendants and Border States shall enter into a protocol for the identification, return, and deletion of Border States' confidential, proprietary, and trade secret information. The parties shall be solely responsible for their own attorneys' fees and expenses related to the forensic protocol. The parties shall equally split all fees and expenses of the forensic expert;

f)      An award of attorneys' fees, costs, and expenses incurred as a result of the

action;

g)      A trial by jury as to all issues properly tried to a jury; and

h)      Such further and other legal and equitable relief as the Court may deem just
and necessary under the circumstances.


Dated: November 17, 2025                          Respectfully submitted,

                                                  /s/ *Adam Israel*

                                                  Adam K. Israel
                                                  **BALCH & BINGHAM LLP**
                                                  1901 Sixth Avenue North, Suite 1500
                                                  Birmingham, AL 35203
                                                  Phone: (205) 226-3495
                                                  aisrael@balch.com

                                                  Brian A. Mead  (*pro hac vice forthcoming*)
                                                  Alivia Combe-DuQuet (*pro hac vice
                                                  forthcoming*)
                                                  **MCDERMOTT WILL & SCHULTE LLP**
                                                  444 West Lake Street, Suite 4000
                                                  Chicago, IL 60606
                                                  Phone: (312) 372-2000
                                                  bmead@mwe.com
                                                  aduquet@mwe.com

                                                  Omar Abdel-Hamid (*pro hac vice
                                                  forthcoming*)
                                                  **MCDERMOTT WILL & SCHULTE, LLP**
                                                  500 North Capitol Street, NW
                                                  Washington, D.C. 20001
                                                  Phone: (202) 756-8627
                                                  oabdelhamid@mwe.com

Docusign Envelope ID: 4P5384D9-467C-46D4-988A-AFB750A4E3C7

## VERIFICATION

I, Lee Moseley, as Area Director of the Gulf States for Border States Industries, Inc., hereby declare under penalty of perjury that I have read the foregoing **Verified Complaint**, and that I know the allegations set forth therein to be true, except those made on information and belief, as to which I believe them to be true to the best of my knowledge, information and belief.

Dated this 12th day of November, 2025.

Signed by:

_Lee Moseley_

839E66F7C6A44A4...

Lee Moseley